# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CELITA SANFORD,

    Petitioner,

v.

ANTHONY STEWART,

    Respondent.
_____/

CASE NO. 2:15-CV-11171
HONORABLE SEAN F. COX
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL *IN FORMA PAUPERIS*

Celita Sanford, ("Petitioner"), presently on parole supervision with the Michigan Department of Corrections, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, through counsel, Valerie Newman and Robert W. Stevenson, challenging her convictions for voluntary manslaughter, Mich. Comp. Laws, § 750.321, and felony-firearm, Mich. Comp. Laws, § 750.227b. For the reasons stated below, the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

### I. Background

Petitioner was originally charged with second-degree murder and felony-firearm. Following a jury trial in the Wayne County Circuit Court, petitioner was found guilty of the lesser included offense of voluntary manslaughter and guilty as charged of felony-firearm. This Court recites verbatim the relevant facts regarding petitioner's conviction from the Michigan Court of Appeals's opinion, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See e.g. Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

1

At trial, defendant stated that she lived with the victim for six years and had dated him for 11 years. She testified regarding the victim's physically abusive behavior during their relationship. Indeed, multiple witnesses spoke of the victim's physical abuse of defendant. According to defendant, the victim, on the basis of previous demands made by defendant, was supposed to move out of defendant's house on the day of the shooting. And after the two engaged in an argument over a party that she refused to attend, the victim became angry, resulting in defendant's decision to pack his clothes. As defendant walked out of the kitchen, she heard a pop and saw some smoke from a gun. She believed that the victim had intentionally shot at her. The victim then tossed the gun in a bedroom and started assaulting defendant. She explained, "I said wow. I said, what the f* *k; what the—what is wrong with you? He didn't say what was wrong. He started fighting me. He was fighting." Defendant testified that the victim began pulling her hair and that they ended up in the bedroom as the tussle developed. At some point, the victim also started to choke defendant, which frightened her given that she had passed out the last time he choked her. The victim then threw defendant on the ground and started looking for his gun that he had earlier discarded in the bedroom, but defendant found it first. Defendant claimed that she picked up the gun and started backing away from the victim, who then lunged toward her. Defendant heard a pop and then dropped the gun as the victim grabbed his side. Defendant later testified regarding why she shot the victim:

> I shot him because I feared for my life being that he already shot once and then when he said, where the f* *k is his gun, and I didn't know where it was, but when I saw him looking through the clothes and I found it first I feared for my life and I may not be here. It's a lot of women that didn't get to make it.

* * *

> Well, when I found the gun and I picked it up and he was coming towards me and I'm backing back and I'm saying, no, I was scared for my life. I didn't know what was going to happen when he came my way being that he had already shot first[.]

* * *

> I don't want to die. I didn't want him to die either, but I knew at that point it was one of us. I was already scared. He had already choked me. He had already fought me, threw me. I had no choice but to defend myself and I was very scared and I shot the gun.

Defendant testified that the victim's assault on her resulted in bruises to her neck, scratches on her face, and the loss of some hair. Defendant also testified that she did not have an opportunity or chance to retreat once the incident began to develop. Defense counsel argued in favor of acquittal based on self-defense.

The prosecutor focused on defendant's statements to others after the shooting, noting her failure to describe the incident in a manner consistent with defendant's trial testimony. Defendant informed one police officer that the victim initially had the gun and dropped it, causing it to discharge in a hallway, and that she then picked up the gun but accidentally dropped it, causing it to discharge, with the bullet striking the victim. Defendant further indicated that the victim had refused to move out of her house despite her demands. Defendant also told the officer that she had caught the victim cheating on her, so she had nothing to say to him and wanted him out of her home. She informed a second officer that the victim had dropped the gun, that the gun discharged when dropped, with a bullet hitting a wall in the hallway, and that she subsequently picked up the gun, at which point it accidentally discharged and the victim was shot. Defendant explained that she had not pointed the gun at the victim, nor had her hand been on the trigger. An evidence technician testified that the gun involved in the case had to be cocked before one could pull the trigger. He also identified a bullet mark in the hallway wall of defendant's home, which mark was located 31 inches above the floor. In closing argument, the prosecutor suggested that defendant shot the victim because of his cheating and because she wanted him out of the house. The jury acquitted defendant of the charge of second-degree murder and instead found her guilty of voluntary manslaughter.

*People v. Sanford*, No. 307747, 2013 WL 5338575, at *1–2 (Mich. Ct. App. Sept. 24, 2013).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 495 Mich. 936 (2014).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. The United States Constitution guarantees a criminal defendant's right to the effective assistance of counsel. Ms. Sanford's defense counsel was constitutionally deficient when she failed to investigate and present an important defense, and these deficiencies prejudiced Ms. Sanford.

II. The United States Constitution guarantees a criminal defendant's right to the effective assistance of counsel. Ms. Sanford's defense counsel was constitutionally deficient when she failed to investigate her own witness and discover that witness' bias, and this deficiency prejudiced Ms. Sanford.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

4

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington,* 562 U.S. at 102. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citing *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

### III. Discusssion

Petitioner argues that she was denied the effective assistance of trial counsel.

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.

5

*Id.* A petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his or her defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted

6

a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Because of this doubly deferential standard, the Supreme Court has indicated that:

Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. at 105.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt, but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011). The "[R]eliance on 'the harsh light of hindsight' to cast doubt on a trial that took place" over six years ago "is precisely what *Strickland* and AEDPA seek to prevent." *Harrington v. Richter*, 562 U.S. at 107.

Petitioner first contends that trial counsel was ineffective for failing to investigate and call an expert on Battered Spouse Syndrome (BSS) or Battered Women's Syndrome (BWS).

The Michigan Court of Appeals rejected petitioner's claim at great length as follows:

In *People v. Christel*, 449 Mich. 578, 589; 537 NW2d 194 (1995), our Supreme Court indicated that BWS testimony has been used in two different contexts in criminal cases, one involving the use of such testimony to help evaluate the credibility of a victim or complainant, which matter *Christel* addressed,[1] and one involving BWS testimony offered by a defendant to support a self-defense claim. The Court observed:

In most cases, the battered woman syndrome is offered by the defendant in a case of

---

[1] The *Christel* Court held that "expert testimony regarding the battered woman syndrome is admissible only when it is relevant and helpful to the jury in evaluating a complainant's credibility and the expert witness is properly qualified." *Christel*, 449 Mich. at 579–580 (footnote original).

7

homicide in which the defendant is claiming self-defense. As one court has explained:

> "[E]xpert scientific evidence concerning "battered-woman's syndrome" does not aid a jury in determining whether a defendant had or had not behaved in a given manner on a particular occasion; rather, the evidence enables the jury to overcome common myths or misconceptions that a woman who had been the victim of battering would have surely left the batterer. Thus, the evidence helps the jury to understand the battered woman's state of mind." [*State v.. J Q,* 130 NJ 554, 574; 617 A.2d 1196 (1993).]
>
> Although we do not express approval or disapproval of this use, we note that our Court of Appeals recently recognized that a majority of jurisdictions favor the admissibility of expert testimony on the issue of the battered woman syndrome when offered as a means of self-defense. See *People v. Wilson*, 194 Mich.App 599, 603; 487 NW2d 822 (1992). [*Christel*, 449 Mich. at 589.]

In *Wilson*, this Court stated that BWS testimony has been used "to explain how a battered spouse reacts to the batterer, to explain the reasonableness of the battered spouse's perception that danger or great bodily harm is imminent, and also to rebut the prosecution's inference that the defendant could have left rather than kill the spouse." *Wilson*, 194 Mich.App at 604. In *Wilson*, the defendant "admit[ted] shooting the victim *while he slept*, but claim[ed] she acted in self-defense following forty-eight hours of abuse and death threats and years of battery." *Id.* at 601 (emphasis added).

Here, defendant proceeded on a straightforward theory of self-defense, which, given defendant's testimony, was a reasonable course of action. In court, defendant described a violent attack, wherein the victim discharged and discarded a gun, he started fighting defendant, choking her and pulling her hair, the victim then attempted to regain access to the weapon, he charged at defendant after she grabbed the gun, defendant was unable to retreat, and she shot the victim. This was not a case, assuming the truth of defendant's version of events, in which BWS testimony was needed to explain her reaction to the victim, to explain the reasonableness of her perception that danger or great bodily harm was imminent, or to rebut an inference that she could have retreated and left the scene rather than shoot the victim. A reasonable juror would likely have concluded that defendant acted in self-defense under the circumstances described by defendant in her trial testimony. However, given the voluntary manslaughter verdict and the rejection of the second-degree murder charge, and considering the instructions provided to the jury, the jurors evidently concluded that, although defendant did not act with malice, she intentionally shot the victim while acting in the heat of passion. See *People v.*

*Mendoza*, 468 Mich. 527, 535; 664 NW2d 685 (2003)("to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions"). We seriously question whether the presentation of testimony on BWS would have altered or countered the conclusion that defendant acted in the heat of passion.

As emphasized by the Supreme Court in its discussion of BWS in *Christel*, 449 Mich. at 592, expert testimony is generally "needed when a [person's] actions or responses are incomprehensible to average people." Recently, our Supreme Court in *People v. Kowalski*, 492 Mich. 106, 124; 821 NW2d 14 (2012), discussed the appropriateness of and need for expert testimony in various instances, including cases involving BWS:

> The common theme in these cases is that certain groups of people are known to exhibit types of behavior that are contrary to common sense and are not within the average person's understanding of human behavior. In these instances, an expert's specialized testimony may enlighten the jury so that it can intelligently evaluate an experience that is otherwise foreign.

Defendant's actions would not be incomprehensible under her description of the events that transpired and her theory of the case. If the victim attacked defendant in the manner that she claimed, her reaction in shooting him could not be deemed as being contrary to common sense, outside the average person's understanding of human behavior, or otherwise foreign. This case is not like *Wilson*, which involved a defendant who shot her husband as he lay sleeping. As we view BWS in the context of a defendant raising a self-defense claim, it would only be useful in assisting a jury where the victim was killed under circumstances that did not outwardly appear to present an imminent threat of great bodily harm or death. See *Wilson,* 194 Mich.App at 604; see also MCL 780.972(1)(a)("An individual ... may use deadly force against another individual ... if ... [t]he individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.").

Assuming that trial counsel did not even contemplate BWS in preparing the defense as claimed by defendant on appeal, we cannot find, considering defendant's account entailing a direct physical attack immediately before the killing, that trial counsel's presentation of a straightforward self-defense claim, absent BWS testimony, fell below an objective standard of reasonableness. Indeed, employing BWS under the circumstances might have been viewed as being counterproductive on the question of self-defense, muddying the waters and suggesting that possibly defendant only had a "perceived inability to escape," rather than being confronted by an actual,

9

inescapable, and imminent threat. *Wilson*, 194 Mich.App at 603–604. [2]

Defendant argues that BWS testimony could have explained to the jury why she initially told the police that the victim accidentally discharged the gun, as victims of abuse often protect the batters and defendant thought that the victim was still alive when she talked to police. However, defendant testified that the police officers were inaccurate and incomplete with respect to her actual statements, which statements, according to defendant, were more supportive of a self-defense claim. In explaining the inconsistencies, defendant never claimed that she was attempting to protect the victim; therefore, it was unnecessary for an expert to explain that battered women often take steps to protect their batterers.

Defendant also asserts that BWS testimony was necessary to defeat the prosecution's claim that she could have retreated by simply leaving the house, as the victims of batterers often feel that they have no choice but to kill rather than to leave their spouse. We find that this argument would have been inconsistent with defendant's version of events. Had defendant argued that, consistent with BWS, she felt it impossible to retreat based on the history of abuse, it would have somewhat negated her stance that she did not retreat because the factual circumstances of the physical attack entirely precluded any type of retreat. As a general observation regarding some of defendant's appellate arguments on BWS, the arguments are unavailing because they do not take into consideration defendant's account of the incident and her explanations, and trial counsel had to build the defense theory around and consistent with her account, not the prosecution's theory of events.

Defendant also maintains that BWS testimony would have bolstered her credibility, and countered the prosecution's attack against her credibility, by explaining why she had stayed in the relationship with the victim despite the years of abuse. The prosecution called into question the severity and existence of past abuse because defendant had remained with the victim, which argument was then used in turn to call into question the self-defense theory and whether she had actually been attacked on the day of the shooting. Additionally, defendant contends that BWS testimony was needed to explain, in the face of testimony by defendant's mother that she never observed abusive behavior, that batterers take great pains to hide their abusive conduct. Further, defendant argues that BWS testimony would have explained that batterers often escalate their violence when victims attempt to end relationships, as defendant tried to do in the case at bar. We do believe that there is some merit in these arguments; however, we find them insufficient to establish the requisite

---

[2]Defendant makes a lengthy argument that trial counsel's actions cannot be viewed as being a matter of trial strategy when counsel was allegedly completely unaware of BWS as a viable option to pursue. We believe that we have properly framed the question as whether counsel was ineffective for failing to contemplate BWS, instead of focusing solely on a traditional self-defense theory, taking into consideration the circumstances of the case and defendant's claims as to what transpired. (footnote original).

10

prejudice.

> As *Wilson* and *Christel* make clear, any expert on BWS could not have testified regarding whether defendant actually suffered from or acted pursuant to BWS and could not have opined that she was actually battered. *Christel*, 449 Mich. at 591; *Wilson*, 194 Mich. App at 605. Rather, the testimony would have been limited to a description of BWS and the symptoms that manifest it. *Christel*, 449 Mich. at 591; *Wilson*, 194 Mich.App at 605. Moreover, as opposed to defendant's failure to call police during episodes of past abuse, defendant's credibility was mostly undermined by the inconsistency between her trial testimony and her statements to others following the shooting, along with her failure to provide relevant and important information in her statements that was included in her trial testimony. With respect to defendant's mother never witnessing the abuse, we believe that the jurors on their own were fully capable of recognizing that a batterer would try to hide his transgressions from others. Any expert testimony on the matter would have been inconsequential under the circumstances. We conclude likewise in regard to the argument that batterers often escalate their violence when there is an attempt by the woman to end a relationship.

*People v. Sanford*, 2013 WL 5338575, at *2–5.

The Michigan Court of Appeals' resolution of petitioner's claim was reasonable, precluding habeas relief. The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles,* 556 U.S. at 123. Defense counsel here chose to pursue a defense of self-defense, which was partially successful, in that it lead to petitioner's acquittal on the second-degree murder charge, an offense carrying up to life in prison, and her being convicted of the lesser included offense of voluntary manslaughter, for which she is already on parole. Petitioner could not have used battered spouse syndrome as an independent defense because "BSS is not itself a defense under Michigan law." *Seaman v. Washington*, 506 F.App'x 349, 360 (6th Cir. 2012)(citing *People v. Christel*, 449 Mich. at 537). Instead, the syndrome is viewed solely as a mental condition about which an expert may testify when "'relevant and helpful to the jury in evaluating a [BSS] complainant's credibility.'"*Id.* (quoting *Christel,* 449 Mich. at 580). It was not necessary to present an expert on battered woman's

syndrome to bolster or explain petitioner's self-defense claim. Defense counsel's failure to present expert testimony concerning "battered woman's syndrome" to support petitioner's self-defense claim was not ineffective assistance of counsel, because the facts related by petitioner at trial, including the victim's prior history of physical abuse and his violent actions at the time of the shooting clearly supported a colorable self-defense claim. *See Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Petitioner is not entitled to relief on her first claim.

In her second claim, petitioner argues that trial counsel was ineffective for failing to investigate the bias of Viki Pullen, one of the victim's other girlfriends, before calling her as a defense witness.

> The Michigan Court of Appeals rejected petitioner's claim as follows:
>
> The witness at issue was an individual who previously had a long-term relationship with the victim. The witness testified that defendant broke up that relationship, that the victim was "a nice man," and that he did not have an "extra violent temper." She denied that the victim subjected her to "a* * whippings" for 11 years, denied that she ever informed defendant about such abuse, and the witness denied that she had commented, outside of the courtroom, that she intended to take the stand and "lie and cry." Trial counsel elicited testimony to the contrary from other witnesses.
>
> On appeal, defendant argues that the witness was biased against defendant, not because defendant broke up the witness's relationship with the victim, but because the witness, on behalf of her daughter, had filed a wrongful death suit against defendant prior to the trial, which suit arose out of the shooting. The victim was the father of the witness's daughter. Defendant contends that trial counsel should have discovered the information about the civil lawsuit before trial and that the lawsuit made the witness biased against defendant, as it was in the best interest of the witness, for purposes of the civil suit, to have defendant found guilty in the criminal trial. The only information in the record concerning this argument is found in the transcript of a hearing that covered both a motion for new trial and sentencing. Trial counsel indicated that she had just learned of the lawsuit after checking court records, that the suit had never previously been disclosed to counsel, and that the civil complaint had not yet been served. The trial court then cut counsel off because the matter had not been contained in the motion for new trial, and the issue was never subsequently raised.

On the limited record, and given that defendant herself was unaware of the suit as she had not been served, we initially question whether trial counsel's performance can be deemed deficient for failing to discover the lawsuit. Defendant contends that because wrongful death actions regularly arise out of homicide cases, and because trial counsel was aware of the familial connections, counsel should have searched court records before calling the witness to the stand. We find this argument a bit strained. Moreover, it appears that trial counsel, who was quite vigorous and thorough in representing defendant,[3] was prepared for some defiance by the witness. Trial counsel was poised to ask the witness about a domestic violence police report she filed against the victim during their relationship, but the court excluded the evidence. And again, counsel was able to elicit testimony contradicting the witness's claims. Defendant testified that the witness told her, prior to the shooting, about the "a* * whippings" she received during the 11–year relationship and that the witness asked defendant if she was also being abused by the victim. Another witness gave comparable testimony and also testified about the plan to "lie and cry" that the witness at issue had revealed outside the courtroom. Assuming trial counsel's performance fell below an objective standard of reasonableness, we simply cannot find, considering the impeachment evidence and the other evidence presented by the prosecution, that there is a reasonable probability that, but for counsel's presumed error, the result of the proceedings would have been different.

*People v. Sanford*, 2013 WL 5338575, at * 6.

As an initial matter, petitioner presented no evidence to the Michigan Court of Appeals or to this Court to establish the existence of any civil lawsuit filed by Ms. Pullen against petitioner. Conclusory allegations by a habeas petitioner, without any evidentiary support, do not provide a basis for habeas relief. *See, e.g., Washington v. Renico,* 455 F. 3d 722, 733 (6th Cir. 2006)(bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring an evidentiary hearing in a habeas proceeding); *Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998)(conclusory allegations of ineffective assistance of appellate counsel do not warrant habeas relief).

In any event, petitioner cannot show that trial counsel was ineffective for calling Ms. Pullen

---

[3] The prosecutor indicated at sentencing that trial counsel's representation of defendant was the best that he had seen in a long time. (footnote original).

as a witness. Counsel apparently had a copy of a domestic violence police report that Ms. Pullen had filed against the victim. Counsel attempted to introduce this evidence, but the court excluded it. Counsel's decision to allow Ms. Pullen to testify may have been part of a strategy to obtain favorable information from this witness. *See Awkal v. Mitchell*, 613 F.3d 629, 643 (6th Cir. 2010).

Finally, petitioner testified that Ms. Pullen had told her prior to the shooting about the abuse she suffered at the hands of the victim. Defense counsel called another witness, Latonya Triplett, who likewise testified that Ms. Pullen told petitioner and Ms. Triplett that the victim had physically abused her. Ms. Triplett also testified that she overheard Ms. Pullen outside the courtroom inform other persons that she planned to "lie and cry" when she was called to testify. (Tr. 10/6/11, pp. 32-37, 71-72). In light of the fact that counsel presented evidence through other witnesses that Ms. Pullen had been the victim of physical abuse at the hands of the victim and had informed petitioner about this, petitioner was not prejudiced by counsel's decision to call Ms. Pullen to testify without adequately investigating her proposed testimony. *See Jackson v. Calderon*, 211 F.3d 1148, 1160-61 (9th Cir. 2000)(Assuming that it ordinarily falls below the *Strickland* level of required competence to put a witness on the stand without interviewing the witness, defendant showed no prejudice, as there was no reasonable probability that the jury relied on aberrant, more damaging, testimony of the first defense witness, much less relied on it to convict when they would not otherwise have done so, where other witnesses testified to a different version of circumstances which preceded the murder). Petitioner is not entitled to relief on her second claim.

## IV. Conclusion

The Court will deny the petition for a writ of habeas corpus. The Court will also deny a

certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.[4] The Court will deny petitioner a certificate of appealability because she has failed to make a substantial showing of the denial of a federal constitutional right. *See also Millender v. Adams,* 187 F. Supp. 2d 852, 880 (E.D. Mich. 2002). The Court further concludes that petitioner should not be granted leave to proceed *in forma pauperis* on appeal, as any appeal would be frivolous. See Fed.R.App. P. 24(a).

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

Petitioner will be **DENIED** leave to appeal *in forma pauperis*.

s/Sean F. Cox  
Sean F. Cox  
United States District Judge

Dated: June 9, 2017

---

[4] "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

15

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CELITA SANFORD,

    Petitioner,

v.

CASE NO. 2:15-CV-11171
HONORABLE SEAN F. COX
UNITED STATES DISTRICT JUDGE

ANTHONY STEWART,

    Respondent.

_____/

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 9, 2017, by electronic and/or ordinary mail.

                      s/Jennifer McCoy
                      Case Manager